**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 21 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

GEORGE JAMES MILLER,

      Plaintiff-Appellant,

  v.

MIKE MULLIN, Warden, Oklahoma
State Penitentiary,

      Respondent-Appellee.

No. 02-6199

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. NO. CIV-99-1696-T)**

Robert W. Jackson (Steven M. Presson, with him on the briefs), Jackson &
Presson, P.C., Norman, Oklahoma, for Plaintiff-Appellant.

Robert L. Whittaker, (W.A. Drew Edmundson, Attorney General of Oklahoma,
with him on the brief), Assistant Attorney General, Criminal Division, Oklahoma
City, Oklahoma, for Defendant-Appellee.

Before **SEYMOUR**, **HENRY**, and **O'BRIEN**, Circuit Judges.

**PER CURIAM.**

     George James Miller, a state prisoner, appeals the district court's decision

denying him habeas relief from his Oklahoma first-degree malice aforethought

murder convictions for the September 17, 1994 death of Kent Dodd. On appeal, Mr. Miller contends that (1) the prosecution engaged in prosecutorial misconduct when it concealed until final closing its theory that Mr. Dodd identified his killer by writing the letters "JAy" in smeared blood; (2) his trial and appellate counsel were ineffective; (3) the Oklahoma Court of Criminal Appeals' application of the heinous, atrocious, or cruel aggravating factor was vague and overbroad; and (4) cumulative error entitles Mr. Miller to relief. We affirm the denial of habeas relief under 28 U.S.C. § 2254.

## I. BACKGROUND

We reiterate the facts of this tragic homicide, drawing largely from the Oklahoma Court of Criminal Appeals' summary in *Miller v. State*, 977 P.2d 1099, 1103-04 (Okla. Crim. App. 1999).

Kent Dodd, a twenty-five year old night auditor at the Central Plaza Hotel, which is located at the intersection of I-40 and Martin Luther King Drive in Oklahoma City, registered, as he typically did, as a guest at 3:15 a.m. on September 17, 1994. Shortly thereafter an assailant attacked Mr. Dodd, stabbed him repeatedly, beat him with hedge shears and a paint can, and poured muriatic acid on him and down his throat. Two and a half hours later, a hotel housekeeper arrived for her morning shift. She called for Mr. Dodd when she saw he was not at the front desk. In response she heard moans from the restaurant area of the hotel.

2

She ran to a nearby restaurant and had the police called. When the officers arrived, Mr. Dodd was still alive. There were several blood trails and signs of struggle in various parts of the hotel.

Mr. Dodd was able to respond to police questioning, but his responses were mostly unintelligible. The police understood him to say his attacker was an African-American man who wore grey trousers. Mr. Dodd died later that day from blunt force trauma to his head.

The hotel cash drawer was open and empty when the police investigated the crime scene. Hotel policy requires each shift to begin with $250 in the drawer. At the end of the shift, the desk clerk places any amount in excess of the deposit in an envelope and drops it into the hotel safe. Only desk clerks knew the amount of cash in the drawer.

Mr. Dodd was known to be an exemplary employee who carefully followed the accounting procedures and whose money count was always correct. After the murder, the hotel manager discovered a deposit envelope containing $100 hidden behind registration forms in a separate drawer.

All of the evidence presented against Mr. Miller at the trial for Mr. Dodd's murder was circumstantial. Mr. Miller had worked as a maintenance man at the Central Plaza Hotel for two weeks about a month before the murder. Mr. Dodd knew Mr. Miller, but knew him under another name, Jay Elkins.

Apparently, the night before the murder, Mr. Miller was broke and tried unsuccessfully to borrow money from several different friends. According to Mr. Miller, he, accompanied by Chris Carriger and Jeremy Collman, went to the Central Plaza on September 16, 1994, at approximately 10:00 p.m. Mr. Miller attempted to cash a check written by Mr. Carriger to Mr. Miller; the visit lasted about five minutes. Mr. Miller indicated to authorities that he was then taken back to his apartment where he remained until mid-morning the following day. After trying to cash the check at other locations, Mr. Carriger returned home and asked his wife, Stephanie Carriger, to write a check to Mr. Miller for $75, and she complied. Mr. Carriger and Mr. Collman gave similar renditions of these events to Mr. Miller's counsel.

Mr. Miller told police he was home with his wife at the time of the murder. Mr. Miller and his wife separated shortly after the murder, and he went to stay with his mother in Sherman, Texas. Mr. Miller's ex-wife, whom he divorced prior to trial, testified he was not at home at the time of the murder and that he had taken her car keys from where she hid them and left. She testified that on the day following the murder, when Mr. Miller returned in her car, he attempted to give her $120. She testified that she found sand in the car and that after the murder, she noticed that a pair of Mr. Miller's khaki shorts and a silk shirt had disappeared. She identified two buttons found at the crime scene to be similar to buttons on the missing shirt.

4

When police questioned Mr. Miller about the $120 he gave to his wife, he claimed he had cashed a paycheck. When the police reminded Mr. Miller that he was not working at the time, he then denied giving his wife the money. *See Miller*, 977 P.2d at 1104.

There is little physical evidence connecting Mr. Miller to the crime scene. According to testimony of the State's forensic scientist, Mr. Miller's sandals could have made the footprints found at the scene, but she could not exclusively identify the sandals. A microscopic drop of blood on Mr. Miller's sandal was "consistent" with Mr. Dodd's blood, but this too could not be exclusively identified. The sample revealed a positive DNA reading, indicating the blood on the shoe was the same type as the blood type of the victim.

## II. DISCUSSION

A jury found Mr. Miller guilty of first degree murder. At the capital sentencing proceeding, the jury then found four aggravating factors: (1) Mr. Miller had a prior violent felony conviction; (2) this murder was especially heinous, atrocious, or cruel; (3) Mr. Miller had killed the night clerk to avoid arrest or prosecution for the robbery; and (4) Mr. Miller was a continuing threat to society. After considering the mitigating evidence, the jury sentenced Mr. Miller to death.

The Oklahoma Court of Criminal Appeals affirmed Mr. Miller's conviction on direct appeal and also denied him post-conviction relief. The federal district

5

court denied Mr. Miller habeas relief on eight claims, but granted Mr. Miller a certificate of appealability (COA) on three of those claims: (1) whether the prosecutor engaged in misconduct through its calculated concealment, until the closing argument, of its theory that the victim wrote "JAy," Mr. Miller's alias, in blood at the crime scene; (2) ineffective assistance of trial and appellate counsel; and (3) cumulative error. We granted review of these three claims, and we also granted a COA on the issue of whether the Oklahoma Court of Criminal Appeals' application of the heinous, atrocious, or cruel aggravating factor has eroded to a vague unconstitutional standard. We affirm the district court's denial of habeas relief as to each claim.

### A. Standard of Review under AEDPA

Because Mr. Miller's habeas petition was filed after the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), AEDPA governs whether Mr. Miller may obtain relief from his death sentence. Under AEDPA, because Mr. Miller's claim was adjudicated on the merits in state court, he is entitled to federal habeas relief only if he can establish that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

6

In *Williams v. Taylor*, 529 U.S. 362 (2000), Justice O'Connor's opinion for the Court stated:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 412-13. "In *Williams,* the Supreme Court declined to refine the meaning of the term 'reasonable' as it is used in the AEDPA, other than to note that while it is 'difficult to define,' it is 'a common term in the legal world and, accordingly, federal judges are familiar with its meaning.'" *Cook v. McKune*, 323 F.3d 825, 830 (10th Cir. 2003) (quoting *Valdez v. Ward*, 219 F.3d 1222, 1230 (10th Cir. 2000) (quoting *Williams* 529 U.S. at 410)).

"'Unreasonableness' is gauged by an objective standard." *Id.* "An unreasonable application of federal law denotes some greater degree of deviation from the proper application than a merely incorrect or erroneous application." *Id.* (internal citations omitted). The Supreme Court recently stated that "[w]e have made clear that the 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith,* 123 S. Ct. 2527, 2534-35 (2003) (quoting *Williams*, 529 U.S. at 413). "In other words," the Court

7

stated, "a federal court may grant relief when a state court has misapplied a 'governing legal principle' to 'a set of facts different from those of the case in which the principle was announced.'" *Id.* at 2535 (quoting *Lockyer v. Andrade*, 123 S. Ct. 1166, 1175 (2003)).

Furthermore,

[a] state court's decision is not "contrary to . . . clearly established Federal law" simply because the court did not cite our opinions. We have held that a state court need not even be aware of our precedents, "so long as neither the reasoning nor the result of the state-court decision contradicts them."

*Mitchell v. Esparza*, 124 S. Ct. 7, 10 (2003) (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)) (internal citations omitted). Thus, we apply this standard notwithstanding the Oklahoma Court of Criminal Appeals' failure to cite or discuss federal case law . *See Cook,* 323 F.3d at 831 (citing *Early* , 123 S. Ct. at 365).

### 1. Prosecutorial misconduct

Mr. Miller maintains that he was unduly prejudiced by the prosecutor's overly suggestive and previously unannounced use of illustrative devices during the final closing argument. During final closing, the prosecutor presented a transparency marked with the letters "JAy" and posited that these letters matched blood smears on the double doors and floor of the murder scene.

Mr. Miller's counsel did not contemporaneously object to the prosecutor's statements.  Tr. trans. vol. X, at 250-53.  Indeed, counsel did not object to the statements until seventy-eight minutes after the statement had been made and the jury had retired to deliberate.  *Id.* at 256-57.  The Oklahoma Court of Criminal Appeals reviewed the contention for plain error.

### a. Standard of review

We apply AEDPA's deferential standard of review to a claim of prosecutorial misconduct.  *See Le v. Mullin,* 311 F.3d 1002, 1013 (10th Cir. 2002).  "Generally, a prosecutor's improper remarks require reversal of a state conviction only if the remarks 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "Alternatively, if the alleged prosecutorial misconduct denied the petitioner a specific constitutional right (rather than the general due process right to a fair trial), a valid habeas corpus claim may be established without proof that the entire trial was rendered fundamentally unfair."  *Id.*

### b. Evidence presented and the closing argument

During the trial, the State presented evidence and testimony concerning the blood found at the crime scene.  Specifically, the State presented testimony from Detective Sgt. Ed Bradway, the crime scene investigator who processed the crime scene and collected the evidence.  Sgt. Harville assisted Det. Bradway and took photographs of the crime scene, and in particular the photographs of the double

9

kitchen doors where most of the blood was found. Mr. Miller notes that the State did not present evidence from a blood spatter expert or a handwriting expert, although both were consulted by the State.

At trial, Det. Bradway testified regarding Exhibits 54-57, which are color photos of the double doors and the floor in front of them. Det. Bradway noted what appeared to be high velocity blood spatter on the right door and smears that looked like "transfer blood" off somebody's hands. *See* Tr. trans. vol. V, at 63-64. Det. Bradway testified that the right-hand spatter appeared red and unsmeared, and postulated that this blood must have been on the door before the transfer blood, in that it had time to dry. Det. Bradway testified that he was unable to obtain prints from any of the smears or wipes.

During the final closing argument[1], the prosecutor showed the jury State Exhibit 55 and told the jury that the most important evidence had almost been overlooked, for they could see the victim "went into his own blood . . . and wrote his killer's name." Tr. trans. vol. X, at 251. The prosecutor then produced a transparency overlay with the name "JAy" written on it. He placed the overlay

---

[1] Oklahoma procedure allows the state to make two closing arguments. It makes its first argument and, after the defense closing argument, it is permitted a second. *See* Okla. Stat. Ann. tit. 22, § 831 ("Thereupon, unless the case is submitted to the jury without argument, the counsel for the state shall commence, and the defendant or his counsel shall follow, then the counsel for the state shall conclude the argument to the jury. During the argument the attorneys shall be permitted to read and comment upon the instructions as applied to the evidence given, but shall not argue to the jury the correctness or incorrectness of the propositions of law therein contained."). The second argument is not limited to rebuttal.

atop Exhibit 55 and matched up the written "JAy" with the blood smear on the wall. He also concluded that Mr. Dodd did not write the name Jay just once: "He wanted to make sure that you saw it, you people . . . . Folks, he wrote the letter J in the lower left-hand corner of that picture. J, which, of course, []usually stands for the word Jay." *Id.* at 252.

In denying relief on this claim, the Oklahoma Court of Appeals stated:

> Contrary to Miller's argument, State's Exhibit No. 55 is not evidence. It was not introduced into evidence and it was not taken into deliberations by the jury. Rather, it demonstrated a reasonable inference from evidence properly disclosed to the defense and properly admitted at trial. In this regard the transparency is akin to counsel writing with chalk on a blackboard. Counsel for both the defense and State are granted wide latitude to draw reasonable inferences from the evidence.

*Miller*, 977 P.2d at 1110.[2]

Mr. Miller argues that he was unduly prejudiced because the prosecutor knew before trial that he intended to suggest that Mr. Dodd was identifying his killer in the blood smear during final closing. The presentation of this "undisclosed bombshell" theory at the final closing left no opportunity for rebuttal or cross-examination. Aplt's Br. at 21.

---

[2] The district court noted that the Oklahoma Court of Criminal Appeals' statement that Exhibit 55, was "not evidence" and "was not introduced into evidence and it was not taken into deliberations by the jury" was incorrect. In fact, Exhibit 55 had been admitted and, as well, disclosed to the defense months before trial. But that is not the focus of the argument, and the misstatement does not change the analysis that the trial court did not commit plain error in allowing the argument and the use of the transparencies.

The State does not deny that it planned this strategy of attack. In his opening, the prosecutor told the jury that Mr. Dodd "certainly wanted to live as the evidence from the scene would indicate, and he wanted Jay captured as you will see." Tr. trans. vol. IV, at 90. In his first closing argument, the prosecution continued building up this yet undisclosed theory, telling the jury that Mr. Miller "left the only witness bleeding out on the ground, the witness who in fact did know who killed him, that Jay had killed him. And I will tell you exactly how the evidence demonstrates that in the second closing." Tr. trans. vol. X, at 159. The State argues it was under no duty to disclose its theory of the case, which involved only inculpatory materials, asserting that "[t]he State is not required to inform the defense as to what significance the State assigns to each exhibit." Aple's Br. at 17.

### c. Analysis

First, as to the review for plain error, Mr. Miller's counsel waited over an hour to object to what the defendant now characterizes as an "undisclosed bombshell." Aplt's Br. at 21. Unlike the situation in *Lambert v. Midwest City Mem'l Hosp. Auth.*, 671 F.2d 372 (10th Cir. 1982), where counsel lodged his objection "[i]mmediately after [opposition] counsel had completed his closing argument," *id.* at 374, here we have no reasoned excuse for delay until *after* the jury began deliberations. The Oklahoma Court of Criminal Appeals appropriately

12

considered whether the trial court had committed plain error when it considered Mr. Miller's belated objection.

Second, we acknowledge that the decision to allow the use of visual aids, including pedagogical devices, rests squarely with the trial court. *Collins v. State*, 561 P.2d 1373, 1380 (Okla. Crim. App. 1977) ("'Argument by means of illustration, such as exhibiting to the jury models, tools, weapons, implements, etc., is a matter of every day practice . . . . [D]iscretion is vested in the trial court to prevent an abuse of the use of such illustrations, and unless there has been such an abuse, this court will not interfere.'") (quoting *Peoples v. Commonwealth,* 137 S.E. 603, 607 (Va. 1927)). "Reversible error is committed when counsel's closing argument to the jury introduces extraneous matter which has a reasonable probability of influencing the verdict." *Lambert*, 671 F.2d at 375-76 (setting aside judgment where counsel's remarks were "improper and prejudicial").

The use of a transparency, which is a pedagogical device, is "more akin to argument than evidence. . . . Quite often [one is] used on summation." *United States v. Bray,* 139 F.3d 1104, 1111 (6th Cir. 1998) (internal quotation marks omitted). "Generally, such a summary is, and should be, accompanied by a limiting instruction which informs the jury of the summary's purpose and that it does not itself constitute evidence." *Id.* (citing *United States v. Wood,* 943 F.2d 1048, 1053-54 (9th Cir. 1991) and *United States v. Sawyer*, 85 F.3d 713, 740 (1st Cir. 1996)). Mr. Miller does not suggest a limiting instruction was requested.

13

Indeed, that option may have been forfeited by delay in making an objection until the jury was deliberating. That delay also foreclosed any opportunity for the trial judge to permit defense counsel to address the jury a second time to rebut the "JAy" argument.

The unsupervised use of pedagogical aids during closing arguments greatly heightens the risk of reversible error. An inherent risk in the use of pedagogical devices is that they may "unfairly emphasize part of the proponent's proof or create the impression that disputed facts have been conclusively established or that inferences have been directly proved." *United States v. Drougas*, 748 F.2d 8, 25 (1st Cir. 1984) (citing J. Weinstein and M. Berger, Weinstein's Evidence § 1006 [07] (1983)).

In *United States v. Crockett*, 49 F.3d 1357 (8th Cir. 1995), the district court permitted the use of overhead transparencies that summarized the testimony presented. The transparencies were challenged on the grounds that they provided argumentative characterizations of defense testimony. In rejecting this challenge, the district court concluded that the visual devices contained only statements that would be considered fair closing arguments. *Id.* at 1361-62.

In *Crockett*, as here, the prosecutor did not give defense counsel advance notice of his planned use of the transparencies during closing argument. However, the district court in *Crockett* did instruct the jury to rely on its own recollection, forbade the use of the transparencies in the prosecutor's rebuttal argument, and

14

permitted the defense a chance to counter the argumentative summaries in its closing. As to the failure to give advance notice, the Eighth Circuit noted that

> That did not concern [the district court judge] and probably would not concern most trial judges. But some might limit use of visual aids in closing argument to those approved by the court well in advance, as suggested in 5 Weinstein & Berger, *Weinstein's Evidence* ¶ 1006[07], at p. 1006-24 (1994). Again, discretionary rulings of this nature will seldom if ever be overturned on appeal.

*Id.* at 1362. We agree that the ability of an appellate court to overturn discretionary rulings on direct review is severely constrained. It is even more attenuated on habeas review.

Our review under AEDPA is deferential, but it is even further simplified by counsel's delayed objection to the transparencies. Although the transparencies may have unfairly emphasized or even exaggerated the significance of the blood spatters, and may have potentially injected a new theory into the case, we cannot say that the Oklahoma Court of Criminal Appeals unreasonably applied federal law when it determined that the trial court's allowing this use was not plain error. *See also United States v. Downen*, 496 F.2d 314, 320 (10th Cir. 1974) (holding that blackboard chart prepared by government, summarizing its theory of case, in courtroom and jury room during deliberation, "in light of the careful and detailed cautionary instructions given by the Trial Court" was not shown to have been an abuse of discretion or prejudicial to defendants); *cf. United States v. Reyes*, 157 F.3d 949, 955 (2d Cir. 1998) (holding that district court did not abuse its discretion in allowing prosecution to use blown-up map of New York State, which

15

had not been admitted into evidence, during its summation in murder and conspiracy trial to show the distances that gang members traveled to visit defendant when he was in prison); *United States v. Tai*, 994 F.2d 1204, 1211 (7th Cir. 1993) (holding error was harmless where prosecution presented firearms during closing argument, as the firearms had no relevance to extortion charge and there was no testimony regarding defendant's firearm and there was no opportunity for further testimony).

In crediting the plain error analysis of the Oklahoma Court of Criminal Appeals we note the closing made by Mr. Miller's trial counsel. Counsel emphasized that Mr. Dodd, when found by the police, did not inform them Jay Elkins was his attacker. Instead, the defense argued, Mr. Dodd, with great difficulty, told the police, "a black man in gray pants" was responsible.[3] Tr. trans. vol. X, at 199. From that version of the facts the defense suggested that Mr. Dodd did not know his attacker and therefore it could not have been Jay Elkins, who was well known to Mr. Dodd. The prosecutor may have intended to spring the transparency surprise in any event, but, in fact, its use directly and dramatically countered a defense argument.

Nevertheless our precedent suggests caution in pushing the prosecutorial envelope. Given the lack of notice of the use of the transparencies, we note that their dramatic presentation during final closing and the potentially inflammatory

---

[3] The State has a different version of Mr. Dodd's dying words. *See* Tr. trans. vol. X, at 238, suggesting that Mr. Dodd stated "Jay" rather than "gray."

16

nature of the prosecutor's comments raise concern. Further, as the Eighth Circuit

has warned:

> [W]e do not encourage the use of such devices in the future. . . . Moreover, in a criminal case, the prosecution runs a tangible risk of creating reversible error when it seeks to augment the impact of its oral argument with pedagogic devices. . . . . *Because the very purpose of a visual aid of this type is to heighten the persuasive impact of oral argument, we will necessarily be more inclined to reverse in a close case if the testimony has been unfairly summarized or the summary comes wrapped in improper argument.*

*Crockett*, 49 F.3d at 1362 (emphasis added); *see also Ellis v. State*, 651 P.2d 1057,

1063 (Okla. Crim. App. 1982) (condemning prosecutor's recreation of the image of

deceased through the use of decedent's trousers and shoes, noting the "illustration

used by the prosecutor served no useful or explanatory purpose but rather only

served to inflame the jury's emotions," but determining the error not to be

reversible).

The government has a great duty to prosecute crimes, especially terrible

crimes such as this one. But as this court and the Oklahoma Court of Criminal

Appeals have consistently warned, we also expect not just marginal but heightened

courtroom ethics on the part of counsel, the government and the defense alike. *With

respect to government conduct, see Le*, 311 F.3d at 1018 ("There is little question

that Mr. Macy's comments on this point were, as the Court of Criminal Appeals

noted, improper and irrelevant. It is difficult to tell from the record whether the

comments were intended to encourage the jury to ignore the court's instructions

regarding mitigating character evidence or simply to insert his opinion as to the

17

evidence provided by defense counsel.") (per curiam); *Paxton v. Ward,* 199 F.3d 1197, 1218 (10th Cir. 1999) (noting that prosecutor's "conduct crossed the line between a hard blow and a foul one, consequently giving rise to a valid constitutional claim*"*); *Le v. State*, 947 P.2d 535, 556 (Okla. Crim. App. 1997) (*"*This Court remains continually astounded that experienced prosecutors jeopardize cases, in which the evidence is overwhelming, with borderline argument.") (internal quotation marks omitted); *Brewer v. State,* 650 P.2d 54, 58 (Okla. Crim. App. 1982) (reversing for new trial and admonishing the prosecutor, noting that "[t]he prosecutor's conduct of not allowing defense counsel an opportunity to be heard on his objections, coupled with the needless ridicule demonstrate a lack of respect for the appellant's constitutional right to a fair trial which this Court shall neither tolerate nor condone"). Prosecutors, as well as defense counsel, would do well to avoid theatrics of questionable or even marginal fairness. Not only do such actions threaten otherwise valid cases, they have the potential to diminish the ethical standing of a noble profession.

**2. Ineffective assistance of trial and appellate counsel**

Mr. Miller contends that he received ineffective assistance of trial counsel based on counsel's failure (1) to prepare for the testimony of the state's forensic scientist concerning the blood discovered on Mr. Miller's sandal; (2) to investigate the negotiation of the check written by Ms. Carriger; and (3) to object to the

prosecutor's closing remarks concerning the alleged "JAy" and "J" identification in the blood smears. "To demonstrate ineffective assistance of counsel a petitioner must establish both (1) that his counsel's performance fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's unreasonable errors, the outcome of his appeal would have been different. *Ellis v. Hargett* , 302 F.3d 1182, 1186-87 (10th Cir. 2002) (citing *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000) and *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)).

The State maintains that these claims were procedurally barred. In the interest of judicial economy, "[w]e need not and do not address these issues, however, because the case may be more easily and succinctly affirmed on the merits." *Romero v. Furlong,* 215 F.3d 1107, 1111 (10th Cir. 2000) (citing *Cain v. Redman*, 947 F.2d 817, 820 (6th Cir. 1991) ("In the present case, it is in the interest of judicial economy for this court to hear this cause in spite of the unresolved issues of exhaustion and procedural default.")); *cf. United States v. Wright*, 43 F.3d 491, 496 (10th Cir. 1994) (addressing a 28 U.S.C. § 2255 petition and declining to address the procedural bar issue because the claim would fail on the merits in any event).

Mr. Miller also contends that appellate counsel was ineffective for failing "to assert that trial counsel were ineffective with respect to several of the omissions previously noted." Aplt's Br. at 37. Claims of appellate counsel ineffectiveness are

19

often based on counsel's failure to raise a particular issue on appeal. *See Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003). "[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (citing *Jones v. Barnes*, 463 U.S. 745 (1983)). Although it is possible to bring an ineffective assistance claim based on counsel's failure to raise a particular issue, "it is difficult to demonstrate that counsel was incompetent." *Id.*

In order to evaluate appellate counsel's performance, "we look to the merits of the omitted issue." *Cargle*, 317 F.3d at 1202 (internal quotation marks omitted). "If the omitted issue is so plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal, its omission may directly establish deficient performance." *Id.* On the other hand, "if the omitted issue has merit but is not so compelling, [we must assess] the issue relative to the rest of the appeal, and deferential consideration must be given to any professional judgment involved in its omission; of course, if the issue is meritless, its omission will not constitute deficient performance." *Id.* (citing *Smith*, 528 U.S. at 288). Because we must examine the merits of the omitted issues to evaluate Mr. Miller's ineffective assistance of appellate counsel claim, we shall address these claims in a consolidated manner.

20

### a. Forensic chemist testimony

Mr. Miller contends that counsel was (a) unprepared to rebut the testimony of Ms. Taylor, the prosecution's forensic chemist, regarding the presence of the H antigen on Mr. Miller's sandal; and (b) should have requested a hearing pursuant to *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Mr. Dodd had A type blood in which the A antigen would be found. Ms Taylor testified that no A antigen was found in the blood sample. She also testified that the H antigen is part of all the blood types and that acid could cause the H antigen to fall away from the primary antigens such as A or B. Thus, she could not exclude any bleeder, including Mr Dodd. Mr. Miller's counsel cross-examined Ms. Taylor on this point, and she agreed that she could not draw a conclusion as to the possible mixing of blood types, and she also agreed that Mr. Miller's blood type (type AB) was absent from each of the samples.

As to the necessity of a *Daubert* hearing, we agree with the district court's statement that challenges to the conclusions drawn by Ms. Taylor regarding her examination of exhibits and methodology goes to her credibility and is properly left to the jury to determine what weight, if any, to give to her testimony. Counsel's cross-examination of Ms. Taylor sufficiently challenged her credibility on each of these issues. Mr. Miller cannot establish deficient performance under *Strickland.*

**b. Failure to investigate the negotiation of the check by Ms. Carriger**

Next, Mr. Miller contends counsel was ineffective for failing to investigate the date of the negotiation of the check written by Stephanie Carriger to Mr. Miller. The check was used by the prosecution to establish that Mr. Miller in fact visited the Central Plaza Hotel hours before the homicide, on the evening of September 16, 1994.

Mr. Miller's postconviction counsel discovered that Mr. Miller cashed the check from Mrs. Carriger *on* September 16, 1994. Doc. 32, ex.3. The bank must have accepted the check during the bank's business hours on September 16, 1994. There is no dispute that Mr. Miller received the check *after* the night he visited the Central Plaza hotel. Thus, the date of the check's negotiation indicates that in fact Mr. Miller's visit to the Central Plaza Hotel preceded the close of business on September 16, 1994. Because there is no dispute that the check was negotiated after Mr. Miller's visit to the Central Plaza hotel with Mr. Carriger and Mr. Collman, those who recalled the date of the trip as being on the night of September 16, 1994, including Mr. Miller, were in error.

Mr. Miller contends that the fact that the check was negotiated *before* the date of the crime would have undermined the testimony of those who recalled Mr. Miller being at the hotel shortly before the crime. The State points out that Mr. Miller told his attorney that he went to the hotel with Mr. Carriger and Mr. Collman on the night of the murder. In addition, counsel relied on statements provided by Mr.

22

Carriger, Mr. Collman, and Mrs. Carriger that supported Mr. Miller's statements. Although investigation of the check might have proven helpful, standing alone, under *Strickland,* counsel's failure to do so cannot be said to have prejudiced Mr. Miller.

### c. Failure to object to the prosecutor's closing argument regarding the purported "JAy" and "J" identification in the blood smears

Mr. Miller next contends that counsel's failure to object to the "JAy" comments was ineffective. We recognize that often, "any effort by the State to deflect responsibility for prosecutorial misconduct or to discount the resultant prejudice by blaming defense counsel for not objecting to/curing the errors would *support* petitioner's case for relief in connection with his associated allegations of ineffective assistance." *Cargle*, 317 F.3d at 1217.

Here, however, we have already addressed the Oklahoma Court of Criminal Appeals' determination that the prosecutor's use of the transparencies was not plain error. Even assuming defense counsel was deficient in failing to object to the prosecutor's final closing arguments, Mr. Miller cannot establish that there is reasonable probability the jury would have acquitted him. *See Spears v. Mullin*, 343 F.3d 1215, 1249 (10th Cir. 2003) ("Even assuming defense counsel was deficient in failing to make these objections, [the defendant] again cannot establish that, had the prosecutor not made these comments, there is a reasonable probability that the jury

23

would have acquitted him of first-degree murder."). There is ample evidence in the record to support the jury's verdict.

Because we hold that Mr. Miller's ineffective assistance of trial counsel claim lacked merit, his appellate counsel was not objectively unreasonable in failing to assert any portion of these claims on direct appeal. *See Cargle*, 317 F.3d at 1202. Thus, we reject Mr. Miller's ineffective assistance of appellate counsel claims.

### 3. The heinous, atrocious or cruel aggravating circumstance

Third, Mr. Miller argues that the trial court's instruction that defined the especially heinous, atrocious, or cruel aggravating circumstances was unconstitutionally vague and failed to limit the jury's discretion. The jury was instructed:

> As used in these instructions, the term "heinous" means extremely wicked or shockingly evil;"atrocious" means outrageously wicked and vile; "cruel" means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others. The phrase "especially heinous, atrocious, or cruel" is directed to those crimes where the death of the victim was preceded by torture of the victim or serious abuse.

Orig. Rec. vol. IV, at 668, Instruction No. 5.

The Oklahoma Court of Criminal Appeals recognized that the instruction omitted the word "physical" from the its definition of "heinous, atrocious, or cruel"

as directed at those crimes that involved "serious physical abuse." *Miller*, 977 P.2d at 1112 ("The court should have instructed the jury this aggravating circumstance is directed to those crimes 'where death of the victim was preceded by torture of the victim or serious physical abuse.'" (quoting Okla. Unif. Jury Instr.– Crim. 2d, 4-73)). The court determined that, given the brutal nature of the attack, including the use of muriatic acid and the protracted consciousness of Mr. Dodd, such omission constituted harmless error. The Oklahoma Court of Criminal Appeals thus rejected Mr. Miller's claim that the definition of the aggravating circumstance is unconstitutionally vague and overbroad.

Here, we are considering whether the heinous, atrocious, and cruel aggravator, as delineated by the trial court, was unconstitutionally vague, in violation of *Maynard v. Cartwright*, 486 U.S. 356, 363 (1988). Since *Maynard*, "[w]e have repeatedly held that Oklahoma's current definition of 'especially heinous, atrocious or cruel' aggravating circumstance is not unconstitutionally vague." *Workman v. Mullin*, 342 F.3d 1100, 1115 (10th Cir. 2003). Mr. Miller concedes that we have "routinely upheld the constitutionality of this aggravating circumstance." *Id.* (citing *Romano v. Gibson*, 239 F.3d 1156, 1176 (10th Cir. 2001); *Thomas v. Gibson*, 218 F.3d 1213, 1226 (10th Cir. 2000); *Medlock v. Ward*, 200 F.3d 1314, 1319 (10th Cir. 2000); *Moore v. Gibson*, 195 F.3d 1152, 1175-76 (10th

Cir. 1999); *Smallwood v. Gibson*, 191 F.3d 1257, 1274 (10th Cir. 1999); *Hooks v. Ward*, 184 F.3d 1206, 1239-40 (10th Cir. 1999); *Foster v. Ward*, 182 F.3d 1177, 1194 (10th Cir. 1999); *Duvall v. Reynolds*, 139 F.3d 768, 793 (10th Cir. 1998).

We agree that although we have repeatedly upheld the application of the aggravating circumstance, to be constitutional the aggravating circumstance must adequately perform a narrowing function. *See Medlock,* 200 F.3d. at 1324 ("[I]n order to conduct a proper analysis of the sentencer's application of the 'heinous, atrocious, or cruel' aggravator, I think it essential to set forth the Oklahoma test for conscious suffering we have found to satisfy the requirements of the Eighth Amendment. Thus, to evaluate whether the 'heinous, atrocious, or cruel' aggravating circumstance was properly applied, we must examine the state court's findings as to the duration of conscious suffering on the part of the victim.") (Lucero, J., concurring).

We agree with the Oklahoma Court of Criminal Appeals that, despite the omission of the word "physical," from the instruction, the instruction still performed its required narrowing function and imposed restraint upon the sentencer. *See Maynard*, 486 U.S. at 363 (striking down former definition of Oklahoma's heinous, atrocious, and cruel aggravator because "[t]here is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and

26

capricious infliction of the death sentence"). Therefore, we must reject Mr. Miller's claim.

**4. Cumulative error**

Finally, Mr. Miller contends that we must reevaluate the effect of cumulative error in this case. "Cumulative error is present when the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *Workman*, 342 F.3d at 1116 (internal quotation marks omitted). "A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Id.* (internal quotation marks omitted).

Here, the Oklahoma Court of Criminal Appeals found five errors and determined their individual and aggregate effects to be harmless:

> 1) the trial judge did not hold a hearing to determine the admissibility of the DNA evidence; 2) an evidentiary harpoon informed the jury [Mr.] Miller had been physically abusive to his wife; 3) the State presented two crimes not shown to involve the use or threat of force against a person to support the "prior violent felony conviction" aggravator; 4) the trial court omitted the word "physical" from the definition of "heinous, atrocious or cruel" as directed at those crimes which involve "torture or serious physical abuse"; and, 5) the victim

27

impact statement made by Mrs. Dodd contained inadmissible references to her dead son appearing to her in dreams.

*Miller*, 977 P.2d at 1114.

We have found no additional errors, and thus we only review the Oklahoma Court of Criminal Appeals' decision under our deferential AEDPA standard. *See Cargle*, 317 F.3d at 1206. Given this level of deference, we cannot determine that the Oklahoma Court of Criminal Appeals' evaluation of the impact of the trial court errors was contrary to or an unreasonable application of clearly established federal law.

## III. CONCLUSION

For the reasons stated above, we AFFIRM the district court's denial of a writ of habeas corpus.