FILED
United States Court of Appeals
Tenth Circuit

February 20, 2008

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

VAUGHN L. FLOURNOY,

　　　　Petitioner - Appellant,

v.

DAVID R McKUNE; ATTORNEY
GENERAL OF KANSAS,

　　　　Respondents - Appellees.

No. 07-3278

(D. Kansas)

(D.C. No. 07-CV-03108-MLB)

**ORDER DENYING CERTIFICATE OF APPEALABILITY**

Before **LUCERO**, **HARTZ**, and **GORSUCH**, Circuit Judges.

　　　　Vaughn L. Flournoy, proceeding pro se, seeks a certificate of appealability

(COA) to appeal the district court's denial of his application for relief under

28 U.S.C. § 2254. *See id*. § 2253(c)(1)(A) (requiring COA to appeal denial of

§ 2254 application).　Because no reasonable jurist could conclude that

Mr. Flournoy's § 2254 petition should have been resolved in a different manner,

*see Slack v. McDaniel*, 529 U.S. 473, 485 (2000), we deny his application for a

COA and dismiss this appeal.

**I.　BACKGROUND**

　　　　Mr. Flournoy was convicted of the 1997 premeditated murder of his

grandmother, Lillian Thomas, and the battery of his girlfriend, Cheryl Key.　His

conviction was affirmed by the Kansas Supreme Court, although the court vacated his sentence and remanded for resentencing. *See State v. Flournoy*, 36 P.3d 273 (Kan. 2001). Ultimately his sentence was affirmed. *See State v. Flournoy*, No. 88,814, 2003 WL 22938959, at *2 (Kan. Dec. 12, 2003). Mr. Flournoy pursued postconviction relief under Kan. Stat. Ann. § 60-1507, but the Kansas Court of Appeals affirmed the trial court's denial of relief, *see Flournoy v. State*, No. 95,426, 2006 WL 3000775 (Kan. Ct. App. Oct. 20, 2006), and the Kansas Supreme Court denied review. On April 20, 2007, Mr. Flournoy filed his § 2254 application in the United States District Court for the District of Kansas.

## II. DISCUSSION

A COA will issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires "a demonstration that . . . includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack*, 529 U.S. at 484 (internal quotation marks omitted). In other words, an applicant must show that the district court's resolution of the constitutional claim was either "debatable or wrong." *Id.*

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides that when a claim has been adjudicated on the merits in state court, a federal court will grant habeas relief only when the applicant establishes that the

state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1), (2).  As we have stated,

> Under the "contrary to" clause, we grant relief only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the [Supreme] Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, relief is provided only if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.  Thus we may not issue a habeas writ simply because we conclude in our independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.

*Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004) (brackets, citations and internal quotation marks omitted).  For those of Mr. Flournoy's claims that were adjudicated on the merits in the state court, "AEDPA's deferential treatment of state court decisions must be incorporated into our consideration of [his] request for COA."  *Dockins v. Hines*, 374 F.3d 935, 938 (10th Cir. 2004).

Mr. Flournoy's application for a COA and appellate brief raise two claims: (1) that prosecutorial misconduct during closing argument violated his due-

process right to a fair trial, and (2) that admission of Ms. Key's preliminary-hearing testimony violated his right to confront the witnesses against him.[1]

## A.    Prosecutorial Misconduct

Mr. Flournoy alleged eight instances of prosecutorial misconduct during closing argument. At trial he failed to object to any of the alleged misconduct. But he raised all eight allegations on direct appeal to the Kansas Supreme Court, which concluded that "[t]he prosecutor's remarks . . . d[id] not rise to the level of violating either Flournoy's right to a fair trial or his Fourteenth Amendment right to due process." *Flournoy*, 36 P.3d at 282. "Generally, a prosecutor's improper remarks require reversal of a state conviction only if the remarks 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Miller v. Mullin*, 354 F.3d 1288, 1293 (10th Cir. 2004) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

Mr. Flournoy contends that in seven instances the prosecutor's argument was not based on the evidence. The Kansas Supreme Court appears to have ruled that in five instances the statements were supported by the evidence. These were the statements to the jury that (1) Ms. Thomas "let it go" after she and

---

[1] In his application for a COA, Mr. Flournoy appears to raise two additional claims: that the alleged instances of misconduct had the cumulative effect of denying his right to due process and that the prosecutor improperly cross-examined him. Because these claims were not presented to the district court, we decline to consider them. *See Rhine v. Boone*, 182 F.3d 1153, 1154 (10th Cir. 1999).

Mr. Flournoy had argued but Mr. Flournoy would not "let it go," R. Doc. 1 at 6a–6b; (2) Ms. Thomas had "raise[d] her arm in probably self-defense, the gun being aimed at her, but her arm was no shield with that .38 Special. It went right through her arm," *id.* at 6d; (3) Mr. Flournoy is a "manipulator" and a "control freak," *id.* at 6e; (4) Mr. Flournoy is "a man that has been avoiding consequences all of his life for his actions," *id.* at 6f; and (5) Mr. Flournoy "wasn't crazy when this happened" and he had been "evaluated" twice for a mental disease, *id.* at 6e–6f. *See Flournoy*, 36 P.3d at 282-84. The state court's ruling was not based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2). With respect to the fifth instance, insofar as Mr. Flournoy contends that the prosecutor was prohibited from discussing his mental condition because he had not raised a diminished-capacity defense, his factual premise is wrong. The jury was instructed on diminished mental capacity. *See Flournoy*, 36 P.3d at 289.

In regards to the remaining two allegations of making arguments not based on the evidence, the Kansas Supreme Court agreed that the prosecutor had erred in (1) stating that before Ms. Thomas's death, Ms. Key had taken a knife from Mr. Flournoy and put it back in the kitchen; and (2) asking the jury to imagine what went through Ms. Thomas's mind before her death, stating that she was either killed immediately or told not to move, and suggesting that only Mr. Flournoy knew whether she pleaded for her life. But with respect to these allegations, the court concluded that the error "had little, if any, likelihood of

changing the result at trial." *Id*. at 283. The court's determination was not unreasonable under § 2254(d)(1) or (2). *See Walker v. Gibson*, 228 F.3d 1217, 1243 (10th Cir. 2000) (prosecutor's appeals to emotion were insufficient to deny fair trial because nature of the crime itself likely produced sympathy before prosecutor had commented), *overruled on other grounds by Neill v. Gibson*, 278 F.3d 1044, 1057 n.5 (10th Cir. 2001).

The eighth alleged incident of prosecutorial misconduct was the prosecutor's calling Mr. Flournoy a liar. The Kansas Supreme Court said that the prosecutor's remarks were improper, but concluded that, in light of the overwhelming evidence against Mr. Flournoy, "the error had little, if any, likelihood of changing the result of the trial." *Flournoy*, 36 P.3d at 284. The Kansas court was undoubtedly correct in stating that the remark was improper under that state's rules of evidence. But we can grant relief only for a violation of federal law. *See Morris v. Burnett*, 319 F.3d 1254, 1277 (10th Cir. 2003) ("Of course, relief can be granted under 28 U.S.C. § 2254 only for violations of federal law, not state law."). And, as noted by the district court, under federal law it is not improper for the prosecution to refer to a defendant as a liar "on account of irreconcilable discrepancies between the defendant's testimony and other evidence in the case." *Bland v. Sirmons*, 459 F.3d 999, 1025 (10th Cir. 2006). Because the prosecutor was commenting on the discrepancies between

Mr. Flournoy's testimony and other evidence at trial, the district court's denial of relief on this ground was clearly correct.

In sum, the district court's denial of relief on the claims of prosecutorial misconduct could not be debated by reasonable jurists.

**B.     Ms. Key's Preliminary Hearing Testimony**

Mr. Flournoy contends that Ms. Key's preliminary-hearing testimony was improperly admitted at trial. Although he cites only to Kansas law, we join the district court in treating his argument as alleging a violation of the Sixth Amendment's Confrontation Clause, as incorporated into the Fourteenth Amendment. Because Ms. Key's testimony was undoubtedly "testimonial" hearsay, *see Crawford v. Washington*, 541 U.S. 36, 51–52 (2004), the Confrontation Clause bars its admission unless (1) Ms. Key was shown to be unavailable and (2) Mr. Flournoy had a prior opportunity to cross-examine her, *see id*. at 53–54. Mr. Flournoy disputes only whether Ms. Key was unavailable.

Mr. Flournoy, citing state and federal law, challenged admission of the preliminary-hearing testimony in his direct appeal to the Kansas Supreme Court, contending that the state had not exercised due diligence in trying to locate Ms. Key. The court disposed of the unavailability issue on state-law grounds, *see* Kan. Stat. Ann. § 60-460(c)(2) (2000 Supp.), without citing any federal Confrontation Clause precedents. *See Flournoy*, 36 P.3d at 285–86. Nevertheless, AEDPA deference is still required. We look not to the authorities

relied on by the state court but to the court's reasoning and result. *See Early v. Packer*, 537 U.S. 3, 8 (2002) ( "A state-court decision is contrary to our clearly established precedents if it applies a rule that contradicts the governing law set forth in our cases or if it confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent. Avoiding these pitfalls does not require citation of our cases—indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." (citation and internal quotation marks omitted)). Our decision in *Cook v. McKune*, 323 F.3d 825 (10th Cir. 2003), is directly in point. The Kansas Supreme Court had ruled on the unavailability of a witness under Kansas law without discussing federal case law. We said that a state court's "failure to discuss or even to be aware of federal precedent does not in itself render a state court's decision contrary to federal law," *id*., 323 F.3d at 831, and reviewed the case under AEDPA's deferential standard. Thus, we apply the AEDPA standard here.

Under *Ohio v. Roberts*, 448 U.S. 56, 74 (1980), *overruled on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004), a witness is not unavailable unless the prosecution has made a good-faith effort to obtain her attendance at trial. Whether the government has made a good-faith effort is "a question of reasonableness." *Cook*, 323 F.3d at 835 (internal quotation marks omitted). In determining the reasonableness of the government's efforts, courts should

-8-

consider the following: (1) "the more crucial the witness, the greater the effort required to secure [her] attendance"; (2) "the more serious the crime for which the defendant is being tried, the greater the effort the government should put forth to produce the witness at trial"; (3) "the defendant's interest in confronting the witness is stronger" in cases "where a witness has special reason to favor the prosecution, such as an immunity arrangement in exchange for cooperation"; and (4) a state should "make the same sort of effort to locate and secure the witness for trial that it would have made if it did not have the prior testimony available." *Id*. at 835–36.

The Kansas Supreme Court described the government attempts to locate Ms. Key:

> During the trial, the prosecutor told the court that she had been unable to personally serve Key with a subpoena. The prosecutor moved the court for a finding of Key's unavailability in order to introduce the preliminary hearing transcript. The State presented testimony from two investigators from the district attorney's office. One testified that he first located Key in May 1998. He said the district attorney's office had trouble getting Key to appear at the preliminary hearing. At the time she lived in Kansas City, Missouri. Her family brought her in for the hearing. Because of the nature of this case, the investigator wrote down Key's date of birth, where she and family members lived, her social security number, and her place of employment. According to the investigator, for out-of-state witnesses such as Key, the district attorney's office often "[goes] through the out-of-state witness act to secure a witness," which is what the State did here.
>
> In June 1999, two investigators attempted to find Key for the trial. One discovered that Key had moved and left no forwarding address. Key's mother had died, so the investigator checked with

other agencies to see where Key might have been living.  He discovered places that Key had worked and got an address on Belfontaine in Missouri where she was receiving unemployment checks.  He went to that address.  Key was not there, but a woman told him she would be back later.  He left a card and a message for Key to call him.  He was told that Key did not have a phone number.  The next day, he returned to the house, and he could hear people talking inside, but nobody would answer the door.  He also went to the last known address of Key's mother, but the house had been condemned by the city.

The investigators prepared out-of-state motions.  A second investigator testified that he tried to locate Key and serve her with a subpoena to testify at trial.  He mailed subpoenas to three addresses, but two of the subpoenas were returned undeliverable.  After out-of-state witness paperwork was filed, the chief investigator for the Jackson County, Missouri, District Attorney's office assisted in attempting to serve Key.  A hearing was set in Jackson County, but investigators were unable to find her.

The second investigator went to Missouri to look for Key, going to four addresses.  At the Belfontaine address he spoke to a young man who initially said Key did not live there, but then said that he knew her but did not know when she would be back.  When the investigator returned to the house later that day, the front door was open, but when he started walking up the sidewalk, the front door slammed.  He heard someone locking the door.  He knocked, but nobody answered.  The young man he had talked to earlier walked up to the front porch.  He was "rude and guarded."  The investigator left his card and a subpoena and asked the young man to give them to Key.

The investigator also learned that Key had been issued a new driver's license with the Belfontaine address on it.  The investigator testified that the Missouri "SRS" gave him a phone number, which he called.  He said the person who answered the phone was very "rude" and said they did not know Key and that she did not live there.

In addition, he also tried to track down Key's brother.  During the investigation, he encountered someone who knew her brother, and this person asked him about Flournoy.  He also found Key's

cousin, who said he would try to contact Key. Later, the cousin told the investigator that Key did not want to be involved and "[t]hat's why she is hiding." Right before trial, the investigator stopped by the Belfontaine house another time and left a note and a subpoena with a young woman.

*Flournoy*, 36 P.3d at 285–86. The court affirmed the trial court's finding that the state had "made a good faith effort to find Key." *Id*. at 286. Mr. Flournoy does not dispute the Kansas Supreme Court's statement of fact regarding the state's efforts to bring Ms. Key to court. Rather, he disputes whether those facts support the conclusion that the government put forth a good-faith effort.

No reasonable jurist could debate that the Kansas court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); *see Roberts*, 448 U.S. at 75–77 (affirming determination that witness was unavailable).

## III. CONCLUSION

Because no reasonable jurist could debate the district court's denial of relief, we DENY Mr. Ewing's application for a COA and DISMISS this appeal.

ENTERED FOR THE COURT


Harris L Hartz
Circuit Judge